# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRET PATRICK DORCY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-1858 |
| | ) | |
| vs. | ) | Judge Nora Barry Fischer |
| | ) | |
| CAROLYN W. COLVIN | ) | |
| Acting Commissioner of Social Security | ) | |
| | ) | |
| Defendant, | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Bret Patrick Dorcy ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-1383f ("SSA"). This matter comes before the Court on cross-motions for summary judgment. (Docket Nos. 8; 12). The record has been developed at the administrative level. (Docket No. 6.)[1] For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

### II.    PROCEDURAL HISTORY

On April 29, 2009, Plaintiff applied for SSI, asserting disability beginning January 1, 2007. (R. at 21). On May 25, 2010, Plaintiff subsequently filed a Title II application for a period of disability and disability insurance benefits also beginning January 1, 2007. (R. at 141).

---

[1]    Citations to the Record, *hereinafter*, "R. at __".

1

Plaintiff alleged he is disabled to due to rheumatoid arthritis.[2] (R. at 23). This claim was denied on July 16, 2010. (R. at 21). Plaintiff appeared and testified at a hearing held on September 29, 2011, where an impartial vocational expert also appeared and testified. (R. at 37-62). At the hearing, Plaintiff amended the onset date from January 1, 2007 to October 16, 2008, which coincides with Plaintiff's last day of gainful employment. (R. at 40-41). On October 14, 2011, the Administrative Law Judge ("ALJ") determined Plaintiff was not disabled within the meaning of the SSA. (R. at 21-30). Plaintiff then filed a request for review with the Appeals Council, which was likewise denied on October 26, 2012 (R. at 1), thereby making the judgment of the ALJ the final decision of the Commissioner.

A complaint was filed in this Court by the Plaintiff on December 21, 2012, seeking review of the Commissioner's decision to deny Plaintiff's previous claim. (Docket No. 3). Defendant filed his answer on April 8, 2013. (Docket No. 5). On May 6, 2013, Plaintiff filed a Motion for Summary Judgment, (Docket No. 8), accompanied by a Brief in Support of Plaintiff's Motion, (Docket No. 9). This was followed by Defendant's Motion for Summary Judgment on May 29, 2013, (Docket No. 12), and a corresponding Brief in Support of his Motion. (Docket No. 13).

III.    STATEMENT OF FACTS

A.    *Plaintiff's General Background*

Plaintiff was born on July 2, 1988, making him twenty-three at the time of his administrative hearing.[3] (R. at 42). He lives at home with his family. (R. at 165). During an

---

[2]    Rheumatoid Arthritis is a long-term disease that leads to inflammation of the joints and surrounding tissues. It can also affect other organs. PubMedHealth, Rheumatoid Arthritis, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001467/ (last viewed on July 22, 2013).

[3]    Plaintiff is a "Younger Person" Pursuant to 20 C.F.R. §§ 404.1563, 416.963.

average day, Plaintiff wakes up around 10:00 a.m., eats breakfast and takes prednisone[4] as well as fish oil pills. (*Id*.). After taking a shower, he tries to ride an exercise bike, take a walk and do his daily stretching exercises. (*Id*.). At night, he watches TV and then goes to bed at around 1:00 a.m. (*Id*.). In his free time, he also likes to read the news, go bowling, lift weights and shoot basketball even though he cannot run or jump due to his condition. (R. at 169). He also swims about once a week. (*Id*.). Around the house, he is able to wash dishes, do some laundry and help mow the lawn. (R. at 167). Plaintiff goes outside regularly and has a driver's license, but he drives infrequently because of the pain in his left knee and wrists. (R. at 168). Plaintiff has held one job in the last fifteen years as a produce clerk from August, 2006 until October, 2008. (R. at 159). This job required him to lift boxes of produce onto a cart and then place the produce onto shelves. (*Id*.). He also had to take out the garbage, sweep and mop. (*Id*.). When he was working, he managed his own banking account and paid bills, but now he has no income. (R. at 168).

Plaintiff had reported that he can pay attention for a long time only if he is interested. (R. at 170). He feels that the pain in his knees, wrists and elbows is a nine out of ten at almost all times throughout the day. (R. at 173). He maintains that his use of prednisone causes mood swings and makes it hard for him to concentrate, follow instructions and get along with others. (R. at 170). Even though he contends that the prednisone does not help his pain, he believes that it does reduce his swelling significantly. (R. at 174). To relieve his pain, Plaintiff rides an exercise bike, walks, stretches and takes hot showers. (R. at 174).

B.    *Plaintiff's Medical History*

Plaintiff's first documented medical treatment for rheumatoid arthritis in the record was by Dr. Paul Rosen from Children's Hospital of Pittsburgh, PA beginning on May 31, 2007. (R. at

---

[4]    Prednisone is a corticosteroid (cortisone-like medicine or steroid). It works on the immune system to help relieve swelling, redness, itching, and allergic reactions. PubMedHealth, Prednisone, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011828/?report=details (last viewed on July 22, 2013).

774). Plaintiff had been suffering from joint pain in his back, knees, shoulders, elbows, fingers, wrists and both feet. (R. at 775). Dr. Rosen also identified limitation of motion in multiple joints. (R. at 776). On June 19, 2007, a follow-up examination diagnosed Plaintiff with rheumatoid arthritis. (R. at 773). He was prescribed methotrexate,[5] naproxen,[6] prednisone and folic acid. (R. at 771). That same day, he also participated in physical therapy and occupational therapy. (R. at 764, 768). The Occupational Therapist noted that Plaintiff experiences two flare-ups per day in his shoulders, knees, wrists or fingers and that he could not complete activities of daily living during their occurrence. (R. at 766). Additionally, the swelling in both of his hands limited his range of motion. (*Id.*).

On September 6, 2007, Dr. Rosen observed Plaintiff's improvement in response to treatment. (R. at 758). He was referred to a psychiatrist to be trained on how to take methotrexate without becoming nauseous, and he was switched from naproxen to relefen[7] due to the side effects. (R. at 758-89). Plaintiff was also instructed to begin starting Embrel[8] treatments. (*Id.*). When Plaintiff saw Dr. Rosen a month later, he noted Plaintiff's response to treatment was still incomplete and his course would be unchanged. (R. at 753). Plaintiff continued to have joint pain and swelling and was having difficulty sleeping because of anxiety. (*Id.*). Five weeks later, Dr.

---

[5]     Methotrexate is a tablet that treats Rheumatoid Arthritis, as well as several kinds of cancer. PubMedHealth, Methotrexate, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011139/?report=details (last viewed on July 22, 2013).

[6]     Naproxen is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve symptoms of arthritis (osteoarthritis, Rheumatoid Arthritis, or Juvenile Arthritis) such as inflammation, swelling, stiffness, and joint pain. PubMedHealth, Naproxen, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011337/ (last viewed on July 22, 2013).

[7]     Relefen is a brand name of nabumetone, a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain and help relieve symptoms of arthritis (Osteoarthritis and Rheumatoid Arthritis), such as inflammation, swelling, stiffness, and joint pain. PubMedHealth, Nabumetone, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011314/ (last viewed on July 22, 2013).

[8]     Embrel is an etanercept injection which is used to reduce signs and symptoms of active arthritis, Rheumatoid Arthritis, or Psoriatic Arthritis, such as joint swelling, pain, tiredness, and duration of morning stiffness. This medicine may also slow the progression of damage to the body from active arthritis or Rheumatoid Arthritis. PubMedHealth, Etanercept, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010203/ (last viewed on July 22, 2013).

Rosen observed that he was doing very well since beginning Embrel, reporting there was no joint stiffness. (R. at 751). Because of Plaintiff's progress, his use of methotrexate and folic acid were discontinued, and the prednisone was lowered. (R. at 752). At the next appointment on February 14, 2008, he was experiencing swelling and stiffness in his joints. (R. at 748). Plaintiff's condition was worsening by June 5, 2008 and his response to treatment was poor. (R. at 745). His shoulder had become swollen and painful, disrupting his sleep. (*Id*.). Dr. Rosen decided to discontinue Embrel and start Humira.[9] (R. at 746). It was suggested that Plaintiff see a counselor, but he deferred. (*Id*.).

At his August 7, 2008 appointment, Plaintiff was showing some improvement in his symptoms, possibly related to the Prednisone. (R. at 743). He was still having some morning stiffness, left knee swelling, shoulder pain and trouble sleeping, but he reported that he was able to work at the grocery store without any problems. (R. at 742). Plaintiff last visited Dr. Rosen on August 16, 2008, and the doctor noted that the course was improving even though the response to the treatment was still incomplete. (R. at 739-40). He felt better with regard to his morning stiffness and was still able to work at the grocery store. (R. at 740). However, Plaintiff's daily activities, sleeping patterns and social interaction had all decreased from baseline. (R. at 739).

Plaintiff then began seeing Dr. Viji Selvara as his primary care physician on October 29, 2008 because he was feeling depressed, dealing with anxiety, very hyper, not sleeping and irritable. (R. at 602). He was taking prednisone and weekly injections of Remicade,[10] but he was not feeling much better. (*Id*.). It was noted that Plaintiff spoke with Dr. Hauber, a psychiatrist

---

[9]     Humira is an adalimumab injection used to treat the symptoms and prevent the progression of active Rheumatoid Arthritis and Ankylosing Spondylitis. PubMedHealth, Adalimumab, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0008825/ (last viewed on July 22, 2013).

[10]     Remicade is a brand name of an infliximab injection. Infliximab is a monoclonal antibody used to treat adults with Rheumatoid Arthritis. PubMedHealth, Infliximab, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010708/ (last viewed on July 22, 2013).

who suggested that he should go on Depakote.[11] (*Id*.). Plaintiff was also treated by Dr. Devashis A. Mitra from April 22, 2010 until July, 2011. At the initial visit, Dr. Mitra noted that since Plaintiff's Remicade was discontinued, he had been flaring up. (R. at 616). He still had pain and swelling in multiple joints and his morning stiffness lasted approximately an hour. (*Id*.). Furthermore, while his pain worsened with physical activity, his stiffness increased with rest. (*Id*.).

During this time, Plaintiff was evaluated by a State Agency disability examiner, Dr. Suzanne Brinker, on July 16, 2010. (R. at 68-73). Dr. Brinker concluded that Plaintiff could occasionally lift and carry twenty pounds while frequently lifting or carrying ten pounds. (R. at 69). She had also found that Plaintiff was also capable of standing and/or walking for about eight hours as well as sitting for that same amount of time. (*Id*.). There were no postural, manipulative, visual, communicative or environmental limitations of note. (R. at 70-72). After reviewing the records and Plaintiff's alleged symptoms, Dr. Brinker found that Plaintiff's statements were only partially credible because she determined that his treatment had been relatively effective in controlling his symptoms. (R. at 73).

Plaintiff was also seeing Dr. Sara J. Mester, Dr. Mitra's colleague, from May 2010 until May 2011. On May 19, 2010, Dr. Mester found that the intensity of Plaintiff's pain had improved and that he had an excellent steroid response. (R. at 800). His left knee was still in pain and swollen, but was mild and primarily weather related. (*Id*.). Three months later, the intensity of his pain remained unchanged but he denied extremity weakness. (R. at 798). There were good results from a steroid burst/taper and he resumed Remicade without difficulty. (*Id*.). Plaintiff's next appointment on December 8, 2010 was canceled because he did not have insurance and he

---

[11]     Depakote is a brand name of a valproic acid used primarily to treat seizures, but it is also used to treat mood disorders and prevent migraine headaches. PubMedHealth, Valproic Acid, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010708/ (last viewed on July 22, 2013).

was not willing to get any lab work done. (R. at 797). On January 26, 2011, Plaintiff had returned but was not on any medication and experiencing moderate to severe pain intensity. (R. at 795). His worst affected joints were his left knee and ankle where there was also swelling. (*Id*.). Until he could start medication, he was recommended a brief course of steroids. (R. at 796).

By February 23, 2011, Plaintiff's pain had improved due to his brief steroid trial and he was returned to Remicade. (R. at 785). However, his x-rays revealed degenerative changes in his right hand and wrist and his left knee. (*Id*.). Plaintiff was reportedly stable and improving with the use of Remicade two months later. (R. at 782). It was recommended that he undergo a brief burst of steroids to help the Remicade work more effectively. (R. at 783). The last included appointment record dated July 27, 2011, shows Plaintiff's conditions were relatively stable on Remicade. (R. at 780). The intensity of the pain had slightly increased and his left knee pain and swelling were determined to be linked to variances in activity rather than weather. (*Id*.). Because his conditions remained relatively stable, his current regimen was to remain unchanged. (R. at 781).

Contained in the record is Plaintiff's Pain Diary, which includes a self-reported worksheet for every day between September 3, 2010 and September 20, 2011. (R. at 195-442, 445-593). On each sheet, Plaintiff marked the areas of his body that hurt, and he indicated (based upon a scale of 1-10) various physical and mental symptoms, such as his overall morning, afternoon and evening pain levels; balance; walking ability; amount of sleep; depression; anger; irritability; among others. (*Id*.). Plaintiff also detailed his daily activities, noting his sleep, meals, showers and doctor's appointments.[12] (*Id*.). Based upon a summary sheet[13] of Plaintiff's Pain

---

[12] Plaintiff's also recorded in his pain diary the occasions when he was seeking gainful employment. On May 18, 2011, he noted that he had an interview at Giant Eagle on April 21st and that he also put in an application to 3B's Tobacco. (R. at 463). On July 28, 2011, Plaintiff submitted an application to Shoe Carnival. (R. at 536). He

Diary Worksheets provided by counsel, Plaintiff's subjective complaints of pain had increased during the course of the year in which they were provided. (R. at 541). In September of 2010, Plaintiff's average for each part of the day was between 4 and a 5 but by the following September, each of these pain averages increased to a level between 7 and an 8. (*Id*.).

The record also includes a letter written by Plaintiff's mother, Deborah Dorcy, on September 26, 2011, detailing her son's struggles. (R. at 595). She explains his difficulty walking and standing with his left knee pain. (*Id*.). She notes that on a bad day, he barely moves and that he only has about ten good days a month. (*Id*.).

C.    *Administrative Hearing*

At the hearing, Plaintiff acknowledged that his disability claim is limited only to the pain he suffers as a result of rheumatoid arthritis.[14] (R. at 44-45). He represented that he is in pain due to his rheumatoid arthritis "pretty much every day," (R. at 46), and that it causes swelling in his elbows, wrists, fingers and especially in his left knee. (R. at 55). As a result, he has trouble walking and is forced to occasionally use a cane. (R. at 46). He requires the cane most during the winter, because the colder weather increases his discomfort. (R. at 46-47). Plaintiff states that he experiences the most pain in the morning, and there are some entire days when he will be bedridden. (R. at 48). He has four to five bad days a week and probably deals with morning stiffness for about one to two hours a day. (R. at 57). There is no point in the day when he does not suffer from joint pain or stiffness. (*Id*.). When Plaintiff was still working in the produce department of a grocery store, he would call off of work if he was having a really bad day. (R. at

---

applied to Giant Eagle again on August 8, 2011, (R. at 550), and had another interview on September 1, 2011. (R. at 575). Last, Plaintiff applied to Taco Bell on September 19, 2011. (R. at 592).

[13]     This summary provides the average of Plaintiff's morning, afternoon and evening pain level for each month. (R. at 541).

[14]     The ALJ references that Plaintiff's early reports reference anxiety as well, but Plaintiff and the ALJ agreed that it was not a severe mental health problem which would adversely affect his ability to engage in work activity. (R. at 45).

48).

Plaintiff is able to care for his own personal needs; however, his mother does the chores, laundry and cooking. (R. at 50-51). Although he has his driver's license, he does not drive too often because he gets really dizzy and nervous. (R. at 43-44, 55). He has a high school education and has finished three years of college, but he had taken two years off before recently beginning to take classes again part-time. (R. at 41-42). Plaintiff is trying to get an accounting skills certificate because he believes that he would be capable of working as an accountant or an auditor. (R. at 44).

On average, Plaintiff believes that he could walk about a quarter mile or for about 10-15 minutes before he needs to sit down and rest. (R. at 49). He thinks that he could only stand for twenty minutes at a time. (*Id*.). He would be able to sit for thirty minutes before he would feel compelled to get up and stretch. (*Id*.). Plaintiff struggles picking up objects because his swollen elbows cause his arms to start shaking. (R. at 56).

Plaintiff takes Remicade once every two months. (R. at 51). The Remicade treatment makes him feel exhausted and he struggles to concentrate. (R. at 53). After taking Remicade, he complains that he remains lethargic for about three to four days. (*Id*.). He has been off of the Remicade treatments for a brief period, but during that time his condition worsened. (R. at 54). Plaintiff refuses to take Methotrexate because he would suffer from intolerable nausea. (R. at 52). He had also been on prednisone, but those treatments caused mood swings and angry outbursts. (R. at 55).

Following Plaintiff's testimony, the Vocational Expert, Frances Kinley,[15] was examined by the ALJ to determine the jobs which may possibly be available in the national economy for

---

[15]     Ms. Kinley has been a self-employed vocational consultant since 1994 with previous experience managing, training, supervising and evaluating vocational and medical service consultants. (R. at 114-16).

the hypothetical person who was 23 years old, had more than a high school education and has had experience working as a produce clerk that required a medium exertional level. (*Id*.). Further relevant factors limited the hypothetical individual to sedentary work that affords a sit/stand option where he would not be permitted to engage in crawling, kneeling, balancing on heights or squatting. (*Id*.). He would not be able to engage in constant fine manipulation with the fingers but could involve the frequent use of his hands. (*Id*.). To this inquiry, the vocational expert replied that such a person would best be suited as a food and beverage order clerk, for which there were 30,000 jobs available on the national level. (R. at 60). There were also 35,000 jobs available nationally as a charge account clerk and 50,000 jobs available as a ticket checker. (*Id*.). In addition, there were also approximately about 19,000 jobs available nationally as an inspector that require frequent, but not constant use of the hands. (*Id*.).

The Vocational Expert added that if this hypothetical person went off task ten to fifteen percent of the work day over extended periods of time, the individual would not be able to hold any job in the national economy. (R. at 61). Moreover, if the hypothetical person had to excuse himself on a random basis a couple times per month over the course of multiple months, the individual could not hold a job. (R. at 60).

## IV.     STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate

whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[16] 1383(c)(3);[17] *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to

---

[16] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action … brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. §§ 405(g).

[17] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

review the transcripts and records upon which a determination of the commissioner is based. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).

"Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 90-91 (3d. Cir. 1986).

## V. DISCUSSION

The ALJ concluded that Plaintiff suffers from rheumatoid arthritis, a severe impairment, but his impairment does not meet the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P. Appendix. (R. at 24). The ALJ also found that Plaintiff's medically

determinable impairment could reasonably be expected to cause the alleged symptoms; however, the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's Residual Functional Capacity ("RFC"). (R. at 28). To this end, the ALJ determined that Plaintiff has the RFC to perform sedentary work, except that he requires an at-will sit/stand option; cannot engage in crawling, climbing, kneeling, squatting or balancing on heights and cannot utilize constant manipulation with the fingers. (R. at 26). Considering Plaintiff's personal characteristics and RFC, there are jobs available in the national economy, hence, a finding of "not disabled" was appropriate.

Plaintiff contends that the ALJ erred in five ways during his five-step sequential analysis. He asserts that the ALJ:

1. Erred when he found that Plaintiff's only severe impairment was rheumatoid arthritis.
2. Erred in determining that Plaintiff did not meet an impairment listed in the Listings of Impairments in Appendix 1, Subpart P, Regulations No. 4.
3. Improperly determined Plaintiff's Residual Functional Capacity.
4. Erred in improperly evaluating the Plaintiff's subjective complaints of pain and discrediting the Plaintiff's complaints of pain.
5. Improperly disregarded the Testimony of the Vocational Expert and relied on an incomplete hypothetical question

(Docket No. 9). Defendant argues in its Motion for Summary Judgment that the ALJ's decision that Plaintiff could perform a limited range of light work and that Plaintiff's subjective complaints were not entirely credible, are supported by substantial evidence. (Docket No. 13 at 9, 13).

A.    *Plaintiff's Severe Impairments*

Plaintiff first contends that the ALJ erred in his application of the second step when examining whether he had any severe impairments or combination of impairments that could be considered severe. (Docket No. 9 at 8). Specifically, Plaintiff argues that the ALJ should have

found not only a severe impairment due to his rheumatoid arthritis, but also a severe anxiety and mood disorder resulting from Plaintiff's medication. (*Id.* at 8-9). The ALJ considered this argument, but stated that "there is no documentation to substantiate this assertion." (R. at 25).

A "severe" impairment is defined by the regulations as "any impairment ... which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is not "severe" where the record demonstrates only "slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" *Id.* The plaintiff must establish a mental or physical impairment by providing "medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the applicant's] statement of symptoms." 20 C.F.R. § 416.908. However, "[t]he burden placed on an applicant at step two is not an exacting one." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).

As Defendant correctly identifies in her brief, Plaintiff alleged disability based only upon his rheumatoid arthritis and did not initially claim any potential severe mental impairments. As such, the ALJ informed Plaintiff's attorney during the hearing:

> "I'm going to conclude at this point that [Plaintiff] has no severe mental health problems that would adversely affect his ability to engage in work activity and that his disability claim is limited at least as far as I can see at this point to his rheumatoid arthritis. Is there anything that would indicate otherwise that we don't have records for?"

(R. at 45). In response, the attorney answered "[t]here's nothing that would indicate otherwise." (*Id.*). This exchange was not disputed by Plaintiff at the hearing or through his current appeal.

Further, Plaintiff has not satisfied his burden of establishing, with medical evidence rather than his own statements, any mental abnormality resulting in more than a minimal effect on his ability to work. Defendant first references one record from Dr. Selvaraj in October of

2008 noting that Plaintiff's anxiety and possible side effects from Prednisone resulted in disruptions with customers at work. (R. at 602). However, Plaintiff had not reported that he was fired for failing to get along with others. In fact, he noted that he got along "well" with authority figures. (R. at 171). Further, there are no employment records before this Court that support Plaintiff's contention that his mood caused him any difficulty at work.

Plaintiff also argues that seeing his psychiatrist, Dr. Hauber, from November 2008 until June 2009 establishes that he is severely impaired by his mood disorder. (Docket No. 9 at 9). Plaintiff has not explained how this establishes his claim. None of Dr. Hauber's office notes and/or reports were filed of record. These visits are only referenced in the record by Dr. Selvaraj in one of his notes, (R. at 602), and in the form Plaintiff completed when applying for disability. (R. at 174). Plaintiff next contends the ALJ overlooked a few of Dr. Rosen's evaluations where he reported that Plaintiff was "hyperactive," "withdrawn," "moody" and "anxious." (Docket No. 9 at 9). However, in the second most recent evaluation contained in the record from Dr. Rosen on August 7, 2008, he noted that Plaintiff was still "able to work at the grocery store without any problem" (R. at 742), and notes again at his last appointment that Plaintiff was still working. (R. at 740). Finally, Plaintiff cites his personal Pain Diary, noting how angry he felt on a daily basis. (Docket No. 9 at 9). These diary entries, however, are not reliable medical evidence that can establish an impairment as they are strictly based upon his own unsubstantiated statements. *See* 20 C.F.R. § 416.908 (plaintiff must establish severe impairment through medical evidence and not just his own statement of symptoms).

Despite Plaintiff's admission, (R. at 45), and failure to provide the ALJ with any medical evidence supporting his position that he suffered from a severe mental impairment affecting his ability to work, the ALJ still considered whether Plaintiff suffered from a severe anxiety disorder

by analyzing Plaintiff's Section 12.06 "B" criteria: i.e., activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. (R. at 25-26). The ALJ's conclusion that Plaintiff suffers no limitation in activities of daily living is justified because Plaintiff has never explained how his daily life has been affected by his anxiety. He is still able to pay attention for a long time when he is interested and he still attends class. (R. at 41, 170). When asked what he can no longer do or how he has been affected by his conditions, he only responded that his participation in sporting activities decreased because of his rheumatoid arthritis. (R. at 166).

The record also supports the ALJ's determination that Plaintiff suffers only mild limitations in social functioning and concentration, persistence or pace. Although Plaintiff appears to have few friends and does not socialize too much outside his household, he has the social wherewithal to attend college for the better part of three years, (R. at 41), and participate in a bowling league. (R. at 169). Additionally, Plaintiff spends his days reading the newspaper and watching TV, even though he states he is quickly fatigued, (R. at 48), and has trouble concentrating as a result of the medication. (R. at 53, 170). Finally, Plaintiff has not had any episodes of decompensation, as there is no record of any psychiatric hospital visits. Therefore, the ALJ's determination of Plaintiff's severe impairments is supported by substantial evidence, as the record stands.

B.    *Impairments Listings*

Defendant argues that the ALJ erred during step three of his determination by failing to state the precise section that Plaintiff did not meet under Listing 14.00 for immune systems and by failing to specifically cite to Listing 14.09 for inflammatory arthritis. (Docket No. 9 at 14). Plaintiff is correct that the ALJ's analysis must be sufficiently detailed in order to facilitate

"meaningful judicial review." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-120 (3d Cir. 2000). However, the Third Circuit Court of Appeals has clarified that the ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). The ALJ's step three analysis is sufficient under *Burnett* if the decision "as a whole" illustrates that the ALJ considered all of the relevant factors making his determination and that the petitioner failed to satisfy the requirements for any listing. *Jones*, 364 F.3d at 505.

In determining whether Plaintiff's physical impairments met the severity of any listed impairments, the ALJ noted that he reviewed the medical evidence of record in regard to several listings under Listing 14.00. (R. at 24). The ALJ acknowledged Plaintiff's symptoms, including pain and fatigue but noted that no clinical evidence substantiates the extent to which Plaintiff claims he is disabled. (*Id.*). All of Plaintiff's symptoms attributed to rheumatoid arthritis and their resulting effects on his ability to function, along with the treating physicians' opinions, were then considered in his RFC. (R. at 24). This analysis satisfies the *Burnett* standard as the ALJ provided enough analysis throughout the entire opinion that demonstrates he conducted a meaningful review. *See Stehman v. Comm'r of Soc. Sec.*, 216 F. App'x 249, 252 (3d Cir. 2007) (holding that an ALJ satisfied the *Burnett* standard where the ALJ "reviewed the medical evidence of record, identified the relevant groups of impairments he considered in light of [petitioner]'s medical diagnoses and the medical evidence of record, and pointed out that no medical source had indicated that [petitioner]'s medical status equaled a listed impairment).

Even if the ALJ did err in his step three analysis, the burden still rests on the petitioner to prove that his condition meets every criteria in a listing before he can be considered disabled. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Plaintiff has not provided sufficient evidence to

establish that his impairments meet any criterion in the listing. Given the current record, the ALJ's determination that Plaintiff does not have an impairment or combination of impairments that meets one of the listed impairments is properly supported.

C. *Residual Functional Capacity*

Plaintiff argues that the ALJ erred when determining that he was able to perform the work set forth in the RFC because: (1) the RFC does not properly reflect his severe pain resulting from his rheumatoid arthritis; and (2) because the RFC does not include any limitation resulting from his mental impairments.

A claimant's RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." 20 C.F.R. § 404.1525(a)(1); *see also Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). The Commissioner determines a claimant's RFC by performing a function-by-function assessment of a claimant's ability to do work related activities. *see* S.S.R. 96–8, 1996 WL 374184, at *1 (holding that, in determining a claimant's RFC, the Commissioner "must first identify the individual's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis"); s*ee also* 20 C.F.R. §§ 404.1545, 416.945; *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x. 140, 149 n.7 (3d Cir. 2007)). In making this assessment, the Commissioner must consider all impairments, including those determined to be non-severe. 20 C.F.R. § 404.1545(a)(2). The Commissioner must also consider all of the evidence of record in making a RFC determination. *Burnett*, 220 F.3d at 121 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999); *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir.1986)). The evidence of record includes all medical records, as well as "observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247

F.3d at 41. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett,* 220 F.3d at 121 (citations omitted).

In this Court's estimation, the ALJ's conclusion that Plaintiff was capable of performing sedentary work that requires an at-will sit/stand option without performing constant fine manipulation with the fingers is supported by the evidence in the record. The ALJ considered and summarized Plaintiff's testimony at the hearing as well as his self-reported symptoms in the record. (R. at 26-27). The ALJ then provided a functional analysis while discussing how Plaintiff's alleged limitations from rheumatoid arthritis were contradicted by medical evidence and Plaintiff's own testimony regarding his activities of daily living. (R. at 19-20). This analysis was further supported by the ALJ's examination of the medical opinions contained in the record. (R. at 20-21). Significantly, the ALJ recognized that none of Plaintiff's physicians expressed any opinion as to whether he was capable of work. (R. at 28). Further, Plaintiff has presented no medical evidence that establishes his alleged limitations. Accordingly, the Court finds that the ALJ's RFC assessment is supported by substantial evidence.

The ALJ concluded that Plaintiff was capable of sedentary work, which only requires that he be able to lift up to ten pounds at a time and permits occasional walking or sitting. 20 C.F.R. § 416.967(a). Based upon the record, Plaintiff is certainly capable of meeting this minimal exertion level. Plaintiff conceded in his Function Report that he could lift up to thirty pounds. (R. at 170). The Vocational Expert also testified that his previous job as a produce clerk was at the medium exertional level, (R. at 59), which required lifting no more than fifty pounds and carrying no more than twenty five pounds regularly. 20 C.F.R. § 416.967(c). Furthermore, the State Agency examiner found that Plaintiff could lift twenty pounds occasionally and that he did not have a

need to periodically alternate sitting and standing. (R. at 69). Despite this evidence of greater physical capability, the ALJ instead limited Plaintiff to the ten pound maximum while still accounting for all of Plaintiff's other physical limitations by requiring that the employment does not involve crawling, climbing, kneeling, squatting, balancing on heights or constant fine manipulation with his fingers. (R. at 26).

Even though the ALJ found that Plaintiff does not have any severe mental impairment, he was still limited to unskilled work, which requires only the ability to perform simple duties that can be learned in a short period of time, 20 C.F.R. § 404.1568(a), with the ability to "understand, carry out, and remember simple instructions [and] to respond appropriately to supervision, coworkers, and unusual work situations." SSR 85-15. Again, Plaintiff had previously expressed that he can follow instructions and is able to get along with authority figures. (R. at 170-171). Additionally, Plaintiff has even stated that he believes that he is capable of performing gainful activity consistent with a sedentary RFC. At the hearing, Plaintiff expressed his desire to be an accountant and believes that he would be capable of performing this job. (R. at 44). Further, Plaintiff had documented in his Pain Diary that he submitted applications to Giant Eagle, (R. at 550), 3B's Tobacco, (R. at 463), Shoe Carnival, (R. at 536) and Taco Bell (R. at 562). He even had two separate interviews with Giant Eagle. (R. at 463, 575). All of these applications and interviews occurred during 2011, prior to his administrative hearing. This pursuit of employment amounts to a tacit admission that Plaintiff is capable of performing unskilled, sedentary work.

Accordingly, the ALJ's RFC determination for Plaintiff sufficiently considers all of Plaintiff's physical and mental limitations and is supported by substantial evidence.

D.    *Plaintiff's Credibility Determination*

Plaintiff argues that when determining the RFC, the ALJ improperly evaluated and

discredited his subjective complaints of pain. The ALJ reviewed Plaintiff's alleged physical and mental impairments as well as the symptoms expressed by Plaintiff, then carefully compared them to his medical records. (R. at 26-28). The ALJ concluded that Plaintiff was not entirely credible regarding the intensity, persistence and limiting effects of his symptoms primarily because no physician recorded clinical data that indicated he was disabled and no physician offered any opinion regarding Plaintiff's ability to work. (R. at 28).

"An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir. 1993). However, these complaints of pain will be given "great weight" if they are supported by the evidence of the record. *Mason,* 994 F.2d at 1067–1068. If the ALJ determines that the complaints of pain are supported by medical evidence, the ALJ must "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir. 1999).

"Although an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments, they alone do not carry the day and override the medical opinion of a treating physician that is supported by the record." *Morales*, 225 F.3d at 318. The ALJ may however reject the plaintiff's subjective complaints so long as the ALJ specifies his reasons for rejecting such claims and supports his conclusion by identifying conflicting evidence in the record. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Under the applicable regulations, the ALJ may consider Plaintiff's daily activities as a valid factor when determining the reliability of the claimant's subjective complaints. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). "The ALJ cannot … disregard [] medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the

claimant]'s credibility.'" *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). (citing *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)).

Substantial evidence supports the ALJ's assertion that the intensity of Plaintiff's self-reported symptoms are not supported by the record. The ALJ concluded that Plaintiff's alleged disabling pain due to his rheumatoid arthritis was not entirely credible because his condition has been relatively stable when he is consistent with his treatment. (R. at 28). When Plaintiff first visited Dr. Mitra on April 22, 2010, his pain had been flaring up since his Remicade was discontinued. (R. at 616). Positive results were noted by Dr. Mesta a month later following a steroid treatment and allowed him to resume Remicade. (R. at 798). However, his insurance was canceled, so he was not on medication and his pain intensity had drastically increased by January 26, 2011. (R. at 795). Again, Plaintiff had improved by the end of February due to a brief steroid trial and return to Remicade. (R. at 785). Through the time of the last recorded appointment in the record, July 27, 2011, he had improved with the use of Remicade and his conditions had remained relatively stable with an unchanged regimen. (R. at 781-82). His testimony is consistent that his condition worsens when he is not taking Remicade. (R. at 54).

The ALJ further justified his determination that Plaintiff's documented statements and testimony are not entirely when weighed against other facts from the record. He notes that when Plaintiff amended his alleged onset date, Plaintiff was working part time in a position that was determined to be at the medium exertional level. (R. at 27). Additionally, Plaintiff's ability to care for his personal needs further supports the fact that that he can perform unskilled sedentary exertional work. (*Id*.). For these reasons, the Court holds that the ALJ's explanation of his credibility determination is supported by substantial evidence and is consistent with at least a sedentary RFC.

E.    *Testimony of the Vocational Expert*

Finally, Plaintiff argues that the ALJ erred in the last step of his determination by failing to rely on the Vocational Expert's response that a hypothetical person similar to Plaintiff who missed three or more days of work a month or who was off task 10-15% of the day would not be suitable for any other jobs in the economy. (Docket No. 9 at 11-12). The "[t]estimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). "The ALJ will normally ask the expert whether, given certain assumptions about a claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy." *Id*. Although "the ALJ may proffer a variety of assumptions to the expert, the expert's testimony concerning alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Id*.; *see also Burns*, 312 F.3d at 123. However, "[s]imply because a hypothetical was posed, does not mean that there was sufficient evidence to support it; the ALJ ultimately relies upon only credible, medically established limitations." *Menuto v. Astrue*, 2012 WL 2594339, at *9 (W.D. Pa. June 13, 2012) (citing *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005)).

The question relied upon by the ALJ was based upon a hypothetical person similar to Plaintiff who has the limitations as outlined in the RFC: a sit/stand option that does not require crawling, kneeling, balancing on heights or squatting without constantly engaging in fine manipulation with the fingers. (R. at 29-30). While these limitations are supported by substantial

evidence, the limitations proposed by Plaintiff are not. Plaintiff testified at the hearing that his Remicade treatments caused him to lose concentration and feel exhausted for three to four days. (R. at 53). However, this assertion is not supported by any medical evidence. Indeed, there is no medical record that references Plaintiff's proposed inability to stay on task or regularly attend work. No physician referenced Plaintiff's ability to work, let alone whether he could stay on task or attend work regularly. On the other hand, Plaintiff had previously stated in his Function Report that he could pay attention "for a long time" if he was interested. (R. at 170). Because the ALJ only relies upon "credible, medically established limitations" when relying upon a hypothetical, *Menuto*, 2012 WL 2594339, at *9, the ALJ properly disregarded the disputed hypothetical questions. After reviewing the ALJ's analysis, the Court finds that the ALJ's hypothetical question was appropriate and supported by substantial evidence.

## VII.    CONCLUSION

Based upon the foregoing, the decision of the ALJ is supported by substantial evidence in the record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied, (Docket No. 8), Defendant's Motion for Summary Judgment is granted (Docket No. 12), and the decision of the Commissioner is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fisher
United States District Judge

Dated: August 2, 2013
Cc/ecf: All counsel of record.